## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH E. MCKENZIE,<br><br>              Plaintiff,<br><br>   v.<br><br>YOUNG MEN AND WOMEN'S HEBREW ASSOCIATION AND IRENE KAUFMANN CENTERS d/b/a JEWISH COMMUNITY CENTER OF GREATER PITTSBURGH,<br><br>             Defendant. | Civil Action No. 2:25-cv-01373<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW the PLAINTIFF, Kenneth E. McKenzie, through his undersigned attorneys, who, in support of his COMPLAINT, respectfully avers as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Kenneth E. McKenzie ("McKenzie" or "Plaintiff") brings this civil action under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.* ("ADAAA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA").

2.     McKenzie — a loyal, long-time employee — was subjected to, and continues to be subjected to, retaliation and discrimination in the terms and conditions of his employment by being denied client referrals and promotions due to his disabilities and because he has and continues to oppose conduct made unlawful by the ADAAA and PHRA.

## PARTIES

3.      Plaintiff Kenneth E. McKenzie is a 48-year-old man who resides in Allegheny County, Pennsylvania. He was born legally blind and remains legally blind.

4.      Defendant Young Men and Women's Hebrew Association and Irene Kaufmann Centers d/b/a Jewish Community Center of Greater Pittsburgh ("JCC" or "Defendant") is a social service, recreational, and educational organization with two facilities located in the Pittsburgh area, its South Hills facility located at 345 Kane Boulevard, Pittsburgh, PA 15243 ("JCC South Hills"), and its Squirrel Hill headquarters located at 5738 Forbes Avenue, Pittsburgh, PA 15217 ("JCC Squirrel Hill").

5.      At all relevant times, the JCC employed more than 20 full-time employees.

6.      At all relevant times, the JCC was a covered "Employer" within the meaning of ADAAA and the PHRA.

7.      On information and belief, the JCC employed more than 500 full-time employees at all relevant times.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his related state law claims under 28 U.S.C. § 1367.

9.      Venue is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391, as Defendant maintains offices and facilities and resides within this federal District in Pennsylvania.

## FACTS

10.     McKenzie has a bachelor's degree in Exercise Science from Slippery Rock University, a master's degree in Exercise Science from California University of Pennsylvania, and numerous fitness, exercise, and health-related certifications.

11.     McKenzie is a National Academy of Sports Medicine Performance Enhancement Specialist, a National Strength and Conditioning Association Certified Strength and Conditioning Specialist, a Yoga Alliance Certified Registered Yoga Teacher, and from 1999 to 2013, was a USA Weightlifting Certified Club Coach.

12.     McKenzie has worked as a physical trainer and in physical fitness-related positions for over 20 years.

13.     McKenzie is highly qualified to train individuals in a wide range of yoga, cardio, strength, and resistance fitness techniques.

14.     Though born legally blind, McKenzie retained some functional vision until about 2010, when despite undergoing nearly 20 surgeries from then on, McKenzie became completely blind and began using a guide dog.

15.     In August 2013, McKenzie applied to be a Fitness Coordinator at JCC South Hills.

16.     During McKenzie's interview with then-Fitness Director, Bonnie Livingston ("Livingston"), she told him that the Fitness Coordinator position was already filled but he could apply to be a Personal Trainer.

17.     Though Livingston expressed concern about McKenzie's ability to work as a Personal Trainer due to his blindness, once he demonstrated he could do so, she hired him.

18.     Person Trainers are responsible for, *inter alia*, training JCC members, maintaining fitness equipment and training areas, and promoting fitness programs. They report to the Fitness Director and are paid on a sliding scale based on qualifications for sessions they teach, and they receive commissions for selling service contracts.

19.     Though Personal Trainers were responsible for managing their own books of business, the JCC referred potential clients to the Personal Trainers for initial sessions.

20.     In practice, Personal Trainers receive most of their clientele from JCC referrals for assessment.

21.     When the JCC receives inquiries from potential clients, it is supposed to distribute them on a rotating basis to Personal Trainers for assessment, unless a client requests a specific trainer or fitness program.

22.     As a part-time Personal Trainer, McKenzie initially succeeded in building a client base at the JCC through its rotation-referral system.

23.     However, when McKenzie asked for more work, JCC staff either told him "no" or asked him to clean the fitness center.

24.     In mid-2016, then-Fitness Coordinator, David May ("May"), separated from the JCC South Hills.

25.     Shortly after, on August 17, 2016, McKenzie emailed Livingston to express interest in the position and to outline his credentials.

26.     Livingston told McKenzie that the JCC was eliminating the Fitness Coordinator position.

27.     However, thereafter, the JCC moved Personal Trainer Christina Irwin ("Irwin") to May's desk and had her take over May's duties, making her the *de facto* Fitness Coordinator.

28.     When Irwin left the JCC in mid-2017, the JCC appointed Steve Manns ("Manns") to be Fitness Coordinator.

29.     The JCC appointed Manns to Fitness Coordinator without asking McKenzie to apply, reviewing his previous letter, or posting the position internally or externally.

30.     In truth, the JCC never eliminated the Fitness Coordinator position, contrary to its representations to McKenzie in 2016.

31.     Unlike McKenzie, none of the JCC's Fitness Coordinators were disabled.

32.     During the COVID-19 pandemic, McKenzie, along with other Personal Trainers, lost a significant portion of his client-base and had to rebuild when restrictions began to ease.

33.     In November 2020, McKenzie, as is routine, submitted his updated fitness certifications to Manns, including his yoga certification, and told Manns, "If I can teach a class, let me know."

34.     When Manns, in turn, asked McKenzie if he had "some sort of stretching cert," McKenzie responded, "Steve, [m]y yoga is primary. You know NCSA & PES have sections on flexibility. I don't carry AFAA anymore [and] that had a large portion on flexibility. Yoga is awesome especially with knowledge of other disciplines."

35.     After the JCC eased pandemic restrictions, McKenzie struggled to attract clients because the JCC did not give him the same number of referrals it gave others.

36.     As a result, McKenzie asked JCC staff, including Manns and the Wellness and Operations Director, Elaine Cappucci ("Cappucci"), for more referrals, assignments, and assistance with building his client base, to no avail.

37.     In an October 2021 email to Cappucci, McKenzie reiterated his qualifications and interest in more work, stating, "You mention yoga soon more than once. Why? Need an

instructor? Haven't taught in a while but if Steve recalled & I may have told you as well I am RYTE certified as of last Sept 2020."

38.     In 2022, McKenzie received no referrals for assessment until August.

39.     On April 26, 2022, Cappucci, copying Manns, asked McKenzie to conduct a one-time yoga class, reinforcing that she and Manns were aware of McKenzie's yoga certifications.

## THE DEKA PROGRAM

40.     From Spring 2022 onwards, McKenzie was ostracized in a series of events related to adoption and promotion of "DEKA," a national fitness program administered by certified instructors that involves cardio, strength, and flexibility training.

41.     McKenzie was familiar with the DEKA program and its concepts and principles due to his extensive background in the subject area, and he could have quickly and easily become DEKA-certified.

42.     Through spring and early summer 2022, the JCC began preparations to adopt DEKA, which would later include hiring a new Fitness Coordinator and asking Personal Trainers to become DEKA-certified.

43.     Further, in the following months and years, JCC recruited and considered applications for Personal Trainers and instructors from administrative staff, membership, and people who were not fitness professionals.

44.     However, the JCC did not post any DEKA-related job openings, though it did display promotional posters, flyers, and other materials at its facilities, which McKenzie could not see.

45.     The JCC did not inform McKenzie of the DEKA program or the associated work opportunities in an accessible manner, i.e. verbally, by phone, or email.

46.     McKenzie learned of the DEKA program only by coincidence, in June 2022, when a client asked him about a DEKA poster.

47.     When McKenzie in turn asked Manns for more information, Manns told him it was "only a class."

48.     By summer of 2022, the JCC planned to promote Manns to be Assistant Department Director and oversee the DEKA program.

49.     Around this same time, Manns arranged for Janelle Pica ("Pica"), a friend of his who was unaffiliated with the JCC, to be hired as Fitness Coordinator once Manns was promoted.

50.     On July 5, 2022, while still Fitness Coordinator, Manns emailed McKenzie that the JCC was cancelling McKenzie's "Ask the Trainer" sessions temporarily, and that he would let McKenzie know of other work opportunities.

51.     On August 5, 2022, McKenzie conducted the only fitness assessment he received in all of 2022.

52.     On August 26, 2022, the JCC circulated a "Personnel Update" email announcing Manns' promotion to Assistant Department Director ("DEKA").

53.     The following week, Pica was hired as Fitness Coordinator, but no "Personnel Update" announced her hire.

54.     The JCC did not inform McKenzie of its need for DEKA certified trainers or the extent of the DEKA program until September 1, 2022, when it conducted a meeting about DEKA with the entire staff of both JCC facilities in the Pittsburgh area.

55.     At this meeting, McKenzie learned that Manns had been promoting DEKA extensively for the past several months, that it would overhaul a substantial portion of Fitness

Department programming, and that Manns would be primarily responsible for implementing the DEKA program.

56.     Further, McKenzie learned that Cappucci hired an outside trainer, Holly Janze ("Janze"), as a yoga instructor to support other DEKA instructors; that Manns had asked another Personal Trainer, Medardo Lomeli ("Lomeli"), to assume a prominent role teaching DEKA classes; and that Pica was hired as Fitness Coordinator.

57.     Before Pica's hire, she was **not** DEKA-certified, and she only became certified on September 10, 2022, after Manns announced her as the new Fitness Coordinator.

58.     Similarly, Lomeli was not DEKA-certified at the time Manns asked him to teach in the program — rather, Lomeli became DEKA-certified on June 30, 2022.

59.     McKenzie never had a chance to apply for, or be considered for, the DEKA roles or the Fitness Coordinator position.

60.     On September 12, 2022, McKenzie raised concerns of discrimination surrounding DEKA's implementation with Manns. Among other things, McKenzie asked Manns:

- Why Lomeli was selected for a prominent role in DEKA and McKenzie was not. Manns replied that it was because McKenzie was not DEKA-certified;

- Why McKenzie was overlooked again for the Fitness Coordinator position; and why the JCC hire Pica, who was outside the JCC, less experienced, held fewer certifications, and was returning to fitness after more than four years outside the field. Manns denied having anything to do with Pica's hire, despite Facebook posts in July and August 2022 and before showing they were friends from at least 2017 and that Pica credited Manns for her 2022 hire.

- Why Janze was hired for yoga when McKenzie was yoga-certified. Manns denied any knowledge of McKenzie's certifications.

- Why all trainers were not offered the opportunity to become DEKA certified, to which Manns replied only that, "I understand."

- Why DEKA jobs were not posted, to which Manns told him to "ask [Cappucci]."

61.     McKenzie then emailed Manns reiterating the above and his concerns that the JCC was "unfairly hiring and negatively limiting my past & future employment, satisfaction and financial stability."

62.     Manns did not respond and forwarded McKenzie's email to Cappucci, who then forwarded it to JCC's HR Manager, Jennifer DiGirolamo ("DiGirolamo")

63.     On September 15, 2022, DiGirolamo told McKenzie that the "JCC is not obligated to post all positions that we are trying to fill," and that the DEKA job "was a position that required very specific skills and [it] was determined it did not need to be posted." DiGirolamo further told McKenzie to "let [Cappucci] know if you would like to be considered for any future positions."

64.     McKenzie asked DiGirolamo, "Why does the JCC continue to discriminate against me…? Is it because I am blind," and he asserted that the JCC exercised its "discretionary" power to avoid promoting him due to blindness.

65.     Further, he reiterated his questions about why the JCC did not post positions; why other trainers were offered more opportunities; why he was not asked to apply, for or interview for, the Fitness Coordinator, yoga instructor, or DEKA-certified positions; why was he not given opportunities to obtain DEKA-certifications; why he was "overlooked for the last 9 years for opportunities in class instructor positions;" why the JCC hired Pica and promoted Lomeli; and how non-DEKA trainers could obtain more clients.

66.     DiGirolamo responded by reiterating substantially the same answers as in her September 15, 2022 email, further stating that "[s]ometimes our open positions are not even posted to the public."

67.    On October 6, 2022, Membership Director (and later DEKA director as of November 2022) Kelly Hont ("Hont") took updated photos of training staff, at Manns' request.

68.    During the shoot, Hont asked McKenzie how much he could see, and when McKenzie asked why it mattered, Hont responded that she was "just asking."

69.    McKenzie asked Hont not to take photos of his guide dog, stating that he was "not the token of the JCC," to which Hont replied, "nobody's doing that, I don't need any attitude."

70.    On October 13, 2022, McKenzie, proceeding *pro se*, dual-filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. In it, he alleged he had been discriminated and retaliated against based on his visual impairment when the JCC passed over him for the Fitness Coordinator position and jobs related to the DEKA program, and that the discrimination and retaliation was continuing. *See* Ex. 1 – Charge of Discrimination.

## DEFENDANT'S ONGOING DISCRIMINATION AND RETALIATION

71.    On October 24, 2022, a JCC Personal Trainer, Peer Kaufmann ("Kaufmann"), began DEKA certification courses and, subsequently, to teach DEKA classes without being pre-certified.

72.    On November 17, 2022, McKenzie attended a Fitness Department meeting at which Cappucci reiterated that fitness assessments would be assigned "equally" if staff listed themselves as available in JCC's "Mindbody App."

73.    McKenzie kept open availability for assessments in the MindBody app — however, other trainers in the app had been scheduled for multiple assessments in the following weeks and he had not been scheduled any.

74.    Also at this meeting, the JCC announced the rehire of Robert Waldron ("Waldron") as a Personal Trainer, though Waldron was not DEKA-certified.

75.    In all of 2022, Pica, Kaufmann, Waldron (hired November), and Lomeli received, respectively, 25, 19, 25, and 38 referrals for assessment, while McKenzie received **one**.

76.    On December 15, 2022, Lomeli told McKenzie that the JCC paid for his DEKA certification and that, while Lomeli did not ask to be involved in DEKA, Manns and JCC employee Jason Kuzman asked Lomeli if he was interested.

77.    Around this time, another Personal Trainer, Sylvia Slavkin ("Slavkin"), told McKenzie that the JCC had conducted performance reviews of the other Personal Trainers.

78.    The JCC had never given McKenzie a performance review.

79.    On December 19, 2023, McKenzie participated *pro se* in an EEOC mediation with the JCC.

80.    On January 18, 2023, McKenzie discovered he was locked out of the Mindbody app.

81.    The only people with access to McKenzie's MindBody app account were McKenzie and the Fitness Department management.

82.    When McKenzie called the MindBody app administrators, they told him that his account had been "deactivated by management."

83.    Later, his credentials were restored.

84.    On February 16, 2023, the JCC submitted its Position Statement to McKenzie's EEOC Charge.

85.    On February 20, 2023, McKenzie discovered that his availability in the MindBody app was changed by management.

86.    When McKenzie emailed Cappucci about management's unilateral change of his availability, she asked McKenzie to meet with her and Manns to discuss scheduling.

87.    When McKenzie asked why he was experiencing unexplained MindBody app issues and why he had not been assigned fitness assessments since August 5, 2022, Cappucci responded only that "we do really need to meet with you," and avoided answering.

88.    McKenzie agreed to meet, but told Cappucci that he worked with MindBody tech support, and that they were unable to roll back the scheduling issue without JCC assistance.

89.    Further, McKenzie reiterated that he wanted to receive "equal fitness assessments which is promised in every personal training meeting including the last on Nov. 17 [2022] when you stated 'make sure your MindBody is updated.' Yet I have only 1 fitness assessment in over a year."

90.    On February 22, 2023, McKenzie applied for a Fitness Sales Specialist position and interviewed for it on March 2, 2023.

91.    He was not selected for the Fitness Sales Specialist position.

92.    The Fitness Sales Specialist position was never filled.

93.    In March 2023, Slavkin left the JCC.

94.     Slavkin's "TRX" group class was temporarily discontinued — a course McKenzie could have easily obtained the credentials to teach.

95.    Further, Manns and Waldron divided Slavkin's remaining personal training clients.

96.    McKenzie was given no opportunity to absorb any of Slavkin's work.

97.    McKenzie continued to receive fewer assessment referrals than the other Personal Trainers.

98.    On April 3, 2023, McKenzie, through undersigned counsel, filed a Response to the JCC's Position Statement, recounting the events described above and providing additional supporting evidence for McKenzie's Charge of Discrimination. Ex. 2 – 04/03/2023 Response to Employer's Position Statement.

99.    On April 20, 2023, McKenzie applied for a vacant Fitness Coordinator position to replace Pica.

100.    DiGirolamo informed McKenzie he was not selected for the Fitness Coordinator position on May 1, 2023.

101.    The JCC appointed Lomeli as the Fitness Coordinator instead.

102.    Notably, in April 2023, Lomeli's resume reflects that he acquired a SilverSneakers certification.

103.    The JCC may have paid for Lomeli's SilverSneakers certification, which, in turn, may have been a reason for selecting him to be Fitness Coordinator over McKenzie.

104.    The JCC never offered to pay for McKenzie to become SilverSneakers certified.

105.    On May 8, 2023, McKenzie applied for another vacant Fitness Coordinator position to replace Manns.

106.    McKenzie was not selected, and instead, the JCC hired Trevaughn Brown ("Brown"), an outside candidate, after Waldron declined the position.

107.    Around this same time, Lomeli stepped down as the Fitness Coordinator, going back to a part-time Personal Trainer position.

108.    On June 23, 2023, the JCC hired Blake Stewart ("Stewart") to replace Lomeli as the Fitness Coordinator.

109.    On August 28, 2023, the JCC hired a Personal Trainer, Rebecca Schneider ("Schneider"), despite that McKenzie was available for, and seeking, additional work as a Personal Trainer.

110.    On October 9, 2023, Schneider began teaching the TRX class that was discontinued when Slavkin left the JCC.

111.    On November 10, 2023, Stewart stepped down from full-time to part-time.

112.    On November 24, 2023, Brown stepped down from full-time to part-time and was fired a short time later.

113.    Also in November 2023, Abdi Kater ("Kater") was appointed to be JCC South Hills' Facility and Operations Manager.

114.    In 2023, McKenzie received far fewer assessment referrals than the other Personal Trainers and fitness department coworkers.

115.    In early 2024, the JCC announced a new "Gait, Balance and Fall Prevention Program."

116.    Around this time, JCC hired a Personal Trainer, Matthew Hunter ("Hunter"), despite that McKenzie was available for, and seeking, additional work as a Personal Trainer.

117.    Cappucci arranged for Schneider and Hunter, and perhaps others, to undergo training for the Gait, Balance and Fall Prevention Program; thereafter, these trainers conducted program sessions.

118.    McKenzie was never given the opportunity to participate in or teach sessions for the Gait, Balance and Fall Prevention Program.

119.    On February 29, 2024, McKenzie applied for a Fitness Coordinator position and was rejected. The JCC offered the job to an external person who failed the background check and later declined the offer.

120.    On July 12, 2024, Jordan McGinnis ("McGinnis") was transferred from the Squirrel Hill Facility to be Fitness Coordinator at the JCC South Hills.

121.    From about December 2024 to July 12, 2024, when Fitness Coordinator position(s) were vacant, the JCC never offered McKenzie the job or the opportunity to serve in an interim capacity.

122.    On July 29, 2024, the JCC hired Personal Trainer, Michael Pilgreen ("Pilgreen"), despite that McKenzie was available for, and seeking, additional work as a Personal Trainer.

123.    On August 6, 2024, while watching the Olympics, McGinnis remarked to Pilgreen, Schneider, McKenzie, Hunter, and Stewart, that he "got a kick" out of watching the "Clark Kent guy on pommel horse." When Hunter asked what McGinnis meant by "Clark Kent guy," McGinnis explained that, "He came out and is like practically blind, took his glasses off and just crushed the event, came back down and instantly put the glasses back on." Pilgreen and McGinnis' laughter was followed by an awkward silence.

124.    On September 11, 2024, the JCC hired Personal Trainer, Nicole Auberzinski ("Auberzinski"), despite that McKenzie was available for, and seeking, additional work as a Personal Trainer.

125.    On September 16, 2024, a JCC employee named Lydia asked McKenzie if his seeing-eye dog "ran you into walls." McKenzie was stunned, but he explained that, "no, his job is not to do that."

126.    Later that same day, McGinnis "spotlighted" McKenzie's disability in an email regarding a payroll issue and sarcastically responded to McKenzie's inquiry by opening it with "Hi Ken, if you listen to the email [Mcginnis sent previously]…."

127.    On September 17, 2024, McKenzie emailed DiGirolamo describing the August 6 and September 16, 2024 interactions and, explaining he wanted to take "this opportunity to educate the Jewish Community Center (JCC) on the ableism that it is protecting within its organization…", he pointed out the "growing frequency [of] stigmatizing a person who happens to have a disability especially those who are blind or visually impaired…." Further, he stated, "This is not only determining my career and [livelihood], but the constant ableism is also causing me to reflect on all my interactions there which in turn is poorly affecting my mental wellbeing."

128.    In 2024, McKenzie received 17 assessment referrals.

129.    In 2024, the other trainers employed during the entire year, namely McGinnis and Hunter, conducted about 110 and 40 assessments respectively.

130.    Within only about six months in 2024, Stewart and Schneider respectively conducted about 13 and 17 assessments.

131.    In February 2025, the JCC opened a full-time Personal Trainer position at the South Hills facility, to which McKenzie applied.

132.    On or about March 12, 2025, McKenzie interviewed for the full-time Personal Trainer position.

133.    On April 22, 2025, EEOC Investigator Caitlynn Groves ("Groves") contacted McKenzie's counsel and advised that the EEOC found cause for his disability claims.

134.    No later than May 2, 2025, the JCC and its counsel received notice that the EEOC found cause in McKenzie's claims.

135.    On May 14, 2025, DiGirolamo cancelled the South Hills full-time Personal Trainer position for which McKenzie's application was pending, claiming it was for budgetary reasons and not having the "revenue growth as we anticipated."

136.    At the Squirrel Hill Facility, Personal Trainer Rocco Avena was promoted from part-time to full-time.

137.    The JCC never posted the promotion opportunity, and McKenzie did not have a chance to apply for the full-time position in Squirrel Hill.

138.    Around this same time, the JCC's Squirrel Hill Facility sent out several emails stating, *inter alia*, that "We continue to experience an increase in member activity and overall utilization," that Avena was promoted to full-time, and announcing plans for substantial building renovations.

139.    Similarly, during summer 2025, the South Hills Facility also announced record growth in its internal email announcements.

140.    On June 3, 2025, the EEOC determined that conciliation efforts were unsuccessful.

141.    McKenzie remains an employee of the JCC.

142.    The JCC continues to deny McKenzie advancement opportunities and assessment referrals compared to other Personal Trainers and Fitness Department employees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

143.    On June 11, 2025, the EEOC issued further notice that conciliation failed, and it issued the Notice of Rights related to McKenzie's Charge.

144.    McKenzie has exhausted his administrative remedies.

145.    This action is timely filed.

## CAUSES OF ACTION

### COUNT I
### Violation of Americans with Disabilities Act, As Amended ("ADAAA")
### (*Disability Discrimination, Retaliation*)

146.    The foregoing paragraphs are incorporated by reference.

147.    McKenzie was an employee of the JCC within the meaning of the ADAAA.

148.    McKenzie is blind and this condition substantially limits his ability to perform numerous major life activities that involve the use of vision.

149.    McKenzie's vision impairment is a disability under the ADAAA.

150.    McKenzie is a qualified individual with a disability within the meaning of the ADAAA.

151.    McKenzie's requests for and use of disability accommodations and his complaints and opposition to disparate treatment constitute protected activity under the ADAAA.

152.    Due to his disabilities and in retaliation for his protected complaints and use of ADAAA accommodations, the JCC subjected McKenzie to different standards of conduct; treated McKenzie worse than non-disabled employees; assigned him fewer client referrals; and denied him numerous promotion and career advancement opportunities.

153.    In taking the actions outlined above, the JCC discriminated and retaliated against McKenzie in violation of the ADAAA.

154.    As a result of the JCC's wrongful acts, which are ongoing, McKenzie has suffered, and continues to suffer, severe emotional distress, physical distress, reputational harm, and lost wages, commissions, and benefits.

155.    The JCC's conduct was willful and in reckless disregard of McKenzie's federal rights.

## COUNT II
## Violation of Pennsylvania Human Relations Act
### (*Disability Discrimination, Retaliation*)

156.    The foregoing paragraphs are incorporated by reference.

157.    As a result of the foregoing, the JCC violated the PHRA.

158.    McKenzie's discrimination complaints to the JCC and opposition to

discrimination are protected activity under the PHRA.

159.    The JCC discriminated against McKenzie on the basis of his disability and

retaliated against him for his protected opposition to discrimination, in violation of the PHRA, by

subjecting him to different standards of conduct; treating him worse than non-disabled

employees; assigning him fewer client referrals; and denying him numerous promotion and

career advancement opportunities.

160.    As a result of the JCC's wrongful acts, which are ongoing, McKenzie has

suffered, and continues to suffer, severe emotional distress, damage to his reputation, lost wages,

commissions, benefits, and other emoluments of employment.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, McKenzie asks the Court to:

(a)    Assume jurisdiction of this case;

(b)    Find and declare that the Defendant is liable for disability discrimination and
retaliation in violation of ADAAA and the PHRA;

(c)    Award Defendant backpay and front pay for all lost wages, commissions, and
other emoluments of employment;

(d)    Award McKenzie compensatory damages for pain, humiliation and other
emotional distress and damage to reputation;

(e)    Award McKenzie punitive damages under the ADAAA;

(f)    Award McKenzie attorneys' fees, costs and the expenses of the action;

(g)    Award McKenzie pre- and post-judgment interest as provided by law;

(h)    Award McKenzie such other relief as is necessary to make McKenzie whole; and

(i)    Award McKenzie such other relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Kenneth E. McKenzie, hereby demands a jury trial on all issues so triable in the above-captioned action.

Respectfully submitted,

Dated: September 8, 2025

/s/Zachary K. Maddox
Zachary K. Maddox
PA ID No. 331653
zmaddox@stembercohn.com
John Stember, Esquire
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &**
            **DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KENNETH E. MCKENZIE,

                Plaintiff,

    v.

YOUNG MEN AND WOMEN'S HEBREW
ASSOCIATION AND IRENE KAUFMANN
CENTERS d/b/a JEWISH COMMUNITY
CENTER OF GREATER PITTSBURGH,

                Defendant.

Civil Action No. 2:25-cv-01373

**JURY TRIAL DEMANDED**

## CERTIFICATE OF SERVICE

The undersigned also hereby certifies that the foregoing was served via U.S. Mail upon the following entity:

Pennsylvania Human Relations Commission
301 Chestnut Street
Suite 300
Harrisburg, PA 17101–2702

Dated: September 8, 2025

/s/Zachary K. Maddox
Zachary K. Maddox
PA ID No. 331653
zmaddox@stembercohn.com
John Stember, Esquire
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &
    DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
T.: (412) 338-1445

*Attorneys for Plaintiff*